IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| ITS Engineered Systems, Inc.,[1] | § | Case No. 15-32145 (KKB) |
| | § | |
| Debtor. | § | |

**DECLARATION OF TODD A. HASS IN SUPPORT OF
CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

Todd A. Hass declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.  I am the Chief Financial Officer of ITS Engineered Systems, Inc., the above-captioned debtor and debtor in possession (the "**Debtor**").

2.  On April 17, 2015 (the "**Petition Date**"), the Debtor filed a petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtor continues to operate its business and manages its properties as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.  I am familiar with the Debtor's day-to-day operations, business affairs, and books and records. I have been the chief financial officer of Debtor since September 2013. In order to enable the Debtor to operate effectively, to smooth the transition into chapter 11, and to avoid any potential adverse effects as a result of the commencement of this chapter 11 case, the Debtor has requested various types of relief in several pleadings filed with the Court (the "**First Day Motions**").

---

[1] The last four digits of the Debtor's tax identification number are 6115.

4.       I submit this Declaration in support of the First Day Motions and to otherwise provide the Court with the background facts of this chapter 11 case. Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other management personnel of Debtor, and my review of relevant documents. If I were called to testify, I could and would testify competently to the facts set forth herein.

## THE DEBTOR'S BUSINESS

5.       Debtor conducts its primary operations in Waller County, Texas.  Debtor is a Delaware corporation and is in the business of manufacturing oil field service and steam generation systems for upstream and downstream markets.  Debtor employs approximately 69 people in Waller County, Texas.  Debtor is an indirect subsidiary of Diverse Energy Systems, LLC ("**Diverse**") which purchased the stock of Acquisition Finance Group, Inc. ("**AFG**"), a Delaware corporation, on September 1, 2013.  AFG is the parent company of Debtor.

6.       During calendar year 2014, Debtor had gross sales revenues of approximately $15,859,312.00.   In the normal course of business, Debtor purchases component parts from Diverse and third party vendors and incorporates such component parts into finished products. Upon completion, Debtor sells the majority of its finished products to Diverse at a profit.  Debtor also sells some finished products to Debtor's third party customers.  Due to tight liquidity, which has restricted Debtor's ability to acquire product, Debtor's gross revenues have declined significantly to date in 2015.  However, Debtor fully expects this to change rapidly.  Diverse is diligently seeking to obtain equity funding from third parties to invest significant sums into the Debtor, and Diverse believes a significant equity infusion will occur.

**EVENTS LEADING TO THE CHAPTER 11 CASE**

7. Debtor believes that this bankruptcy case was forced upon it by the Shook Entities' (as hereinafter defined) attempt to manufacture defaults pursuant to the terms of the Lease (as hereinafter defined) in an effort to gain leverage in the Shook Entities' disputes with Diverse. The Shook Entities' actions have damaged Debtor and have caused Debtor to incur significant expense, which will likely continue.

8. Charles Shook owns directly or indirectly Spunky Flat Land Company ("**Spunky**") and FWT Leasing Company ("**FWT**"). Mr. Shook, Spunky and FWT are collectively referred to herein as the "**Shook Entities**."

9. Debtor and Spunky entered into a Commercial Lease (the "**Lease**"[2]) on or about September 1, 2013 for real property located at 6818 FM 2855 in Waller County, Texas (the "**Property**"). Debtor uses the Property as a plant for its manufacturing operations. The Lease commenced on September 1, 2013 and ends on August 31, 2016. The Lease provides that Debtor has an option to purchase the Property by fully satisfying the two loans currently encumbering the Property and owing to Icon Bank of Texas, N.A.

10. Debtor and FWT entered into a certain Equipment Lease[3] commencing on September 1, 2013 and ending on August 31, 2014 relating to certain equipment. Debtor exercised a renewal option for an additional period ending August 31, 2015. The Equipment Lease also provided that it may be terminated at any time by Debtor exercising the purchase

---

[2] At this point in time, Debtor does not admit or deny that the Lease is a lease or executory contract as defined in 11 U.S.C. § 365. Debtor reserves any and all rights relating thereto.

[3] At this point in time, Debtor does not admit or deny that the equipment lease is a lease or executory contract as defined in 11 U.S.C. § 365. Debtor reserves any and all rights relating thereto.

option by tendering payment to FWT or Icon Bank for the unpaid indebtedness owing to Icon Bank relating to such equipment.

11. The Director of Spunky, Charles Shook, was the president, director and majority owner of AFG at the time of Diverse's purchase of the AFG stock. The Shook Entities filed suit against Diverse in a case currently pending under Cause Number 2015-11812 in the 55th District Court of Harris County, Texas. At its essence, that lawsuit alleges that Diverse breached its obligations created in the documents effecting the sale of the AFG stock to Diverse. Debtor is not a party to this lawsuit.

12. At the time the stock of AFG was purchased by Diverse, Debtor was insolvent and had roughly $5 million in unsecured debt. Since the purchase, Debtor has managed to pay down a significant amount of that debt while restructuring. Cash flow has been a major issue for Debtor, particularly as the price of oil has plummeted. Throughout the term of the Lease, Debtor has been a few days late on its rent payments to Spunky with great frequency, creating a course of conduct between the parties that effectively modified the terms of the Lease. Of the eighteen (18) total rent payments made by Debtor to Spunky, ten (10) were made after the due date passed. All of those payments were accepted by Spunky.

13. On March 25, April 3 and April 7, 2015, Spunky sent notices to Debtor through its attorneys alleging that Spunky had not been paid for property taxes, April 2015 rent, April 2015 rent late fee, and monthly escrow for property taxes (hereinafter collectively referred to, "**the First Notice Letters**").

14. On April 9, 2015, Debtor responded to the First Notice Letter providing proof of payment of the property taxes, April rent and the April rent late fee. Spunky cashed a check from Debtor dated March 30, 2015 for the property taxes relating to the Property. Further,

Debtor pointed out to Spunky that the Lease contains no provisions that require it to pay any amounts into escrow.

15. Debtor did not hear anything again about the allegations presented in the First Notice Letters until, suddenly, on April 14, 2015, Spunky, through its attorneys, sent a second notice to Debtor alleging Debtor to be in default of the Lease and giving notice that Debtor's right to occupy the Property would allegedly terminate in three (3) days. I believe this demand was a transparent attempt by Shook, through Spunky, to apply pressure to Diverse in relation to the issues filed in the Harris County lawsuit despite the fact that Debtor and Spunky had essentially modified the terms of the Lease with respect to the due date for rent as well as default for late rent.

16. On April 16, 2015, for the first time, Spunky claimed that it never received the April 2015 rent check from Debtor.[4] Debtor attempted to obtain wire transfer instructions from Spunky's attorneys, but to this point, those instructions have not been received, making it impossible for Debtor to make good on the check Spunky belatedly claimed it did not receive.

17. Despite being tendered a check for the April 2015 rent and the April 2015 late fee, and paid for and the property taxes on the Property, Spunky would not back down from its position that Debtor's right to occupy the Property under the Lease would terminate as of the end of the business day on Friday, April 17, 2015. If Debtor's right to occupy the Property were terminated (which seems to be the goal of the Shook Entities), it will be impossible for Debtor to

---

[4] Debtor mailed the April 2015 rent check to Spunky on April 7, 2015. Debtor mailed the late fee to Spunky on April 9, 2015. To date, neither the April 2015 rent check nor the late fee check have been presented to Debtor's bank for payment. However, Debtor's payment of the property taxes on the Property in the amount of $39,239.27 has cleared Debtor's bank.

continue operating, potentially causing the termination of 69 jobs in an industry where layoffs are prevalent now.

## FIRST DAY MOTIONS AND ORDERS

A.     **Motion to Establish Notice Procedures**

18.    The Debtor requests that the Court implement notice procedures in this chapter 11 case and designate the parties upon who notice must be served. I understand that this motion will minimize confusion regarding procedural matters by regulating the service, notice and filing requirements at the outset of this case. The proposed procedures will ease the Court's administration of this case and materially reduce the economic burden on the Debtor's estate, and are consistent with the procedures approved and utilized in other cases in this District and others.  There are over 300 parties on Debtor's general mailing matrix filed in this case.  Service on all of those parties with every pleading would be extremely expensive and burdensome for Debtor and this estate.

B.     **Motion to Maintain Cash Management System, Bank Accounts and Business Forms**

19.    By its Motion for Entry of Interim and Final Orders Authorizing the Debtor to Continue Using its Cash Management System, Maintain Existing Bank Accounts, and Business Forms and Continue Transactions with Diverse (the "**Cash Management Motion**"), the Debtor seeks authority to maintain its existing cash management system, bank accounts and business forms.

20.    Debtor's primary operating account is at Icon Bank (Account No. ##422) (the "**Operating Account**").  As of the Petition Date, Debtor held a separate operating account at Enterprise Bank (Account No. ##096) which will be closed shortly by the Debtor and the funds

transferred to Debtor's Operating Account.  As of the Petition Date, the Enterprise Bank account held approximately $2,200.00.

21. When one of Debtor's third-party customers pay an invoice, such payments are made to the Operating Account.  When Debtor sells product in the ordinary course of business to Diverse, Diverse and Debtor keep an accounting of the sales price which is incorporated into the amounts owing under the Diverse Credit Facility.

22. In the ordinary course of business, through the Diverse Credit Facility, as Debtor needs cash to pay operating expenses, Debtor writes a check on its Operating Account to pay invoices and expenses.  When such checks are presented for payment at Icon Bank, funds are drawn automatically from a Diverse bank account at Icon Bank into the Operating Account to pay such checks and the indebtedness owing under the Diverse Credit Facility (as hereinafter defined) increases.  For all practical purposes, the Operating Account typically has a zero balance.  The Debtor thus desires to continue to maintain and use their cash management system and bank account in the ordinary course of business, consistent with their past practices (the "**Cash Management System**").  The described transactions between Debtor and Diverse are collectively referred to as the "**Diverse Transactions**."

23. To minimize expenses and interruption to the business, the Debtor requests that it also be authorized to use its existing check stock, correspondence, and business forms, substantially in the forms existing immediately before the Petition Date.

24. The entry of an order granting the Cash Management Motion is necessary to avoid immediate and irreparable harm to the Debtor and its estate.  I have read the factual allegations contained in Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue Using its Cash Management System, (B) Maintain its Existing Bank

Accounts and Business Forms, and (C) Continue Transactions with Diverse, and (II) Granting Related Relief and same are true and correct.

**C.     Motion to Authorize Cash Collateral Usage and Debtor in Possession Financing**

25.     Pursuant to the terms of a certain Promissory Note dated September 1, 2013, Debtor may borrow, on a revolving basis, up to the sum of $3,000,000.00 from Diverse. In conjunction with such borrowing, Debtor executed a certain Security Agreement dated September 1, 2013 granting Diverse a security interest in substantially all of Debtor's assets. Diverse filed a UCC financing statement with the Texas Secretary of State on September 12, 2013 (collectively the "**Diverse Credit Facility**"). As of the Petition Date, Diverse asserts that the amount owing under the Diverse Credit Facility is the sum of approximately $2.0 million.

26.     Through the Diverse Credit Facility, Debtor and Diverse have many transactions by and between them including but not limited to Debtor purchasing component parts from Diverse, Debtor selling finished manufacturing products to Diverse, Diverse loaning money under the Diverse Credit Facility to fund Debtor's normal operating expenses including payroll, inventory purchases, and payments to creditors. Personnel of Diverse also perform certain management and other services for Debtor that are required for the continuation of Debtor's operations including, but not limited to, the following:

> Accounting, human resources, executive, information technology, in-house legal, manufacturing G&A, supply chain services, engineering services and safety (collectively the "**Management Services**").

27.     These services are performed by approximately twenty-five (25) Diverse employees. The salary and related payroll expenses are allocated on a monthly basis by Diverse between Diverse, Debtor and other Diverse related entities based upon the approximate amount of time spent by each such personnel performing the Management Services on Debtor's business

versus the business of Diverse or other Diverse related entities. The allocation to Debtor includes no cost mark-up to the actual salary and related payroll expenses incurred by Diverse. From April 1, 2014 through March 2015, the percentage of the total cost for such personnel allocated to ITS has ranged from 45.9% to 52.4%. If anything, such personnel performed more services for the benefit of ITS than the actual allocation per the management fee to ITS. In other words, ITS benefits from this activity.

28. In order to avoid the administrative burden to allocate between pre and post petition periods for the month of April, 2015, Diverse has agreed to not charge any of the fee for the Management Services to Debtor on a pre or post-petition basis for the services rendered during the month of April 2015. However, commencing May 1, 2015, Diverse requests authority to charge Debtor for such fees for Management Services in the normal course of business to be allocated to Debtor under the Diverse Credit Facility during the week of June 1, 2015 and in the first week of each month thereafter (in other words, in arrears). For the period of April, 2014 through March, 2015, the fee for the Management Services allocated to Debtor ranged from a low of $71,526.10 to a high of $96,544.75 per month.

29. Debtor does not have the personnel or expertise to perform all of these Management Services performed by Diverse. The fees for the Management Services is added to the unpaid indebtedness on the Diverse Credit Facility. The fee for the Management Services is fair and reasonable and in the best interest of Debtor and Debtor's estate. The Debtor would be required to spend more money to acquire sufficient personnel to perform all of these necessary services if Debtor is not allowed to use the services of Diverse's personnel, including the Management Services.

30. Debtor keeps a detailed breakdown of the amounts owing under the Diverse Credit Facility. By its nature, the unpaid balance of the Diverse Credit Facility changes almost on a daily basis.

31. I have read the factual allegations contained in Debtor's Emergency Motion for Interim and Final Orders (I) Authorizing Use of Cash Collateral and Granting Adequate Protection (II) Authorizing Post-Petition Financing, and (III) Granting Related Relief filed in this case and same are true and correct.

### D. Motion to Pay Pre-Petition Wages and Benefits

32. I have read the factual allegations contained in Debtor's Emergency Motion for Interim and Final Orders Authorizing the Debtor to (I) Pay Pre-petition Wages, Salaries, and Other Compensation; (II) Pay Pre-petition Payroll Taxes and Benefits and Continue Benefits Programs, and (III) Direct Banks to Honor Checks for Payment of Pre-petition Employee Compensation and Benefit Related Obligations filed in this case and same are true and correct.

### E. Motion to Provide Adequate Assurance of Payment to Utilities

33. I have read the factual allegations contained in Debtor's Emergency Motion for an Interim and Final Order (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service; (II) Deeming Utilities Adequately Assured of Future Performance; and (III) Establishing Procedures for Determining Adequate Assurance of Payment filed in this case and same are true and correct.

### **CONCLUSION**

34. I respectfully request that the Court grant all relief requested in the First Day Motions, along with any and all other and further relief that the Court may deem to be just and proper.

35. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of April, 2015.

>/s/ Todd A. Hass
>Todd A. Hass
>Chief Financial Officer of
>ITS Engineered Systems, Inc.